```
                    FILED         LODGED
                         RECEIVED

              Jun 15, 2020

             CLERK U.S. DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON AT TACOMA
     BY                              DEPUTY
```

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
## AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRADKEN, INC,<br><br>Defendant. | NO. CR 20-5220-RBL<br><br>**INFORMATION** |

The United States Attorney charges that:

### COUNT 1
### (Major Fraud Against the United States)

**A.     Background**

1.      Defendant BRADKEN, INC. ("BRADKEN") is a manufacturer of specialty steel products. In July 2008, BRADKEN acquired, and since then it has operated, a foundry in Tacoma, Washington (the "Tacoma Foundry"). The Tacoma Foundry has produced steel for the United States Navy since 1984, and is the leading supplier of certain high-yield steel castings used in the construction of naval submarines. In particular, BRADKEN produces castings made of high-yield steel known as "HY-80" or "HY-100." BRADKEN produces these castings as a subcontractor or supplier for a

United States v. Bradken, Inc.
Information - 1

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

prime contractor. The value of the contracts between the prime contractor and the Navy substantially exceed $1 million for each submarine.

2. The HY-80 and HY-100 castings produced by BRADKEN are critical components of the submarines on which they are installed, and some of the castings are used to form the submarine hulls. As a result, it is critical that the mechanical properties of the castings (such as strength and toughness) meet rigorous specifications. These specifications are currently set forth in a publication known as "Tech Pub 300," and were previously contained in a publication known as "Military Specification 23008." The Tech Pub 300 and Military Specification 23008 specifications will collectively be referred to below to as "the Specifications."

3. Each production of molten steel is known as a "heat." Each heat produces one or more castings. When BRADKEN delivers a casting to the prime contractor, it is required to report and certify the testing results for the heat from which the casting was produced. The prime contractor, in reliance on those certifications, in turn certifies to the Navy that the submarine, including the components produced by BRADKEN, satisfies the Specifications. The Navy relies on these certifications in accepting submarines for service and making payments to the prime contractor.

4. The Specifications require BRADKEN to perform certain tests on specimens taken from each heat. One of the required tests is known as the "Charpy V-notch" test. The Charpy V-notch test evaluates the toughness of the steel, that is, the amount of force the steel can withstand before it fails. The Specifications require that a specimen taken from the heat be subjected to three Charpy V-notch tests, and further require that the average result for the three tests be no less than 50 foot pounds with no single result of less than 45 foot pounds. If a casting does not satisfy the Specifications' Charpy-V notch requirements, this increases the risk that the component could fail under certain circumstances, such as a collision.

United States v. Bradken, Inc.
Information - 2

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5.     The Specifications also require a second test called the "tensile" test. Tensile tests determine how steel will perform under tension load. This involves pulling a tensile bar to its breaking point to determine the strength of the material. HY-80 steel must be strong enough to withstand 80,000 pounds of force per square inch. HY-100 steel must be strong enough to withstand 100,000 pounds of force per square inch. Accordingly, in order to meet the Specifications, an HY-80 heat must return test results between 80 and 99.5 kips per square inch (ksi). HY-100 must return test results between 100 and 120 ksi.

6.     BRADKEN conducts metallurgical testing in BRADKEN's metallurgical laboratory, which is overseen by BRADKEN's Director of Metallurgy for the Tacoma Foundry. The Director of Metallurgy is responsible for ensuring that the steel BRADKEN produces meets the technical requirements of the Navy, including the Specifications. The Director of Metallurgy must complete a "Certified Metallurgical Test Report" for each heat setting out the test results and affirming that the heat was tested in accordance with the Specifications.

7.     Between 1977 and May 22, 2017, a person who will be referenced herein as "Person 1" served as a metallurgist, Metallurgy Lab Supervisor, Metallurgy Services Manager, and, from 2009 on, as Director of Metallurgy, for the Tacoma Foundry. Person 1 was responsible for reviewing test results, determining whether those results complied with the Specifications, and then submitting and certifying the results to the prime contractor.

8.     Prior to May 22, 2017, when BRADKEN lab personnel performed a test, they typically recorded the test results on a note card. Person 1 or other lab personnel then copied the test results into a database known as "AS400." After 2008, test results were also entered into a second database known as "B&L." Person 1 used the test results recorded in B&L when submitting certifications to the prime contractor.

United States v. Bradken, Inc.
Information - 3

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## B. The Scheme and Artifice to Defraud

9. Between approximately 1985 and May 22, 2017, in connection with the procurements described above, Person 1 knowingly devised and executed a scheme with the intent to defraud the United States Navy, and to obtain money and property by means of materially false and fraudulent pretenses and representations. Specifically, Person 1 falsely represented to the prime contractor that certain high-yield steel castings manufactured by the Tacoma Foundry complied with the Specifications, when in fact, as Person 1 well knew, the test results for a substantial percentage of the HY-80 and HY-100 castings failed to meet the Specifications.

10. Person 1 made these representations knowing that the prime contractor would rely on them in certifying to the Navy that the submarines provided to the Navy, including the components manufactured by BRADKEN, complied with the Specifications. Person 1's false representations caused the United States Navy to make contract payments that the Navy would not have made if it had known the true characteristics of the steel produced by the Tacoma Foundry. Furthermore, Person 1's false statements and misrepresentations caused the prime contractor to install substandard components on naval submarines, and caused the Navy to accept those submarines and place them into service, thereby potentially placing naval personnel and naval operations at risk.

11. Following BRADKEN INC.'s acquisition of the Tacoma Foundry in July 2008, Person 1 continued to engage in the foregoing scheme to defraud. Person 1 engaged in this conduct within the scope of Person 1's employment by BRADKEN and, at least in part, for the purpose of benefitting BRADKEN. Accordingly, under principles of corporate criminal liability and *respondeat superior*, BRADKEN is criminally responsible for Person 1's scheme to defraud.

//
//

United States v. Bradken, Inc.
Information - 4

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## C. Manner and Means

It was part of the scheme to defraud that:

### 1. The Fraudulent Certifications

12. In cases where BRADKEN's lab personnel recorded failing Charpy V-notch test results on testing notecards, Person 1 altered the notecards to change the Charpy V-notch results from a failing value to a passing value. Person 1 would sometimes change the first digit of the test results on the notecard to increase the result by ten or twenty foot pounds from a failing value to a passing value. For example, if the test returned a value of 37 foot pounds (a failing value), Person 1 would alter the "3" so that it appeared to be a "5," creating the false appearance that the test result was 57 foot pounds.

13. Similarly, in cases where BRADKEN's lab personnel recorded failing tensile test results on a notecard, Person 1 altered the test cards to make it appear that the test had returned passing results. For example, in cases where an HY-80 heat returned a tensile value between 70 and 79 ksi (a failing value), Person 1 would convert the first digit (the 7) to an 8, creating the appearance that the test had returned a passing result of 80 ksi or greater.

14. Person 1 typically entered the accurate (non-passing) test results into the AS400 database, but entered the falsified (passing) results into the B&L database. Person 1 then produced and caused to be produced Certified Metallurgical Test Reports reporting the falsified numbers from the B&L database to the prime contractor, knowing that the prime contractor would rely on those results when certifying to the Navy that the casting met the Specifications.

15. Between 1985 and 2017, Person 1 falsified one or more test results for over 200 heats of high-yield steel provided to the United States Navy for installation in submarines, including heats that produced critical hull components. These heats represented a substantial percentage of all of the known high-yield steel that BRADKEN produced for installation on submarines over this period.

United States v. Bradken, Inc.
Information - 5

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 2. BRADKEN's Misleading Letters of Advisement

16. On May 22 and May 23, 2017, BRADKEN management discovered evidence that Person 1 had falsified Charpy V-notch test results for one heat (heat number 433415). Specifically, BRADKEN discovered that the AS400 database reflected failing Charpy V-notch test values of 33, 27, and 36 foot pounds, while the B&L database reflected passing values exactly twenty foot pounds higher (53, 47, and 56 foot pounds) for the same tests. When BRADKEN representatives examined the original test card, they observed that the non-passing numbers had originally been recorded on the card, but the numbers had been altered to the passing numbers. When members of BRADKEN management confronted Person 1, Person 1 admitted to falsifying the test results for heat 433415, and made statements suggesting that Person 1 had also falsified other test results.

17. On May 26, 2017, BRADKEN submitted to the prime contractor a Letter of Advisement ("LOA") that BRADKEN management knew would be disclosed to the Navy. The LOA disclosed that Person 1 had admitted to falsifying test results for heat 433415. However, BRADKEN did not disclose that Person 1 had made statements suggesting that Person 1 had also falsified other test results. Instead, the LOA stated, inaccurately, that "we know of no indications of additional alterations at this time."

18. On June 1, 2017, BRADKEN conducted a further interview of Person 1. During the interview, Person 1 recanted Person 1's prior admissions, denied altering the test data for heat 433415, and stated that there must have been a legitimate explanation for the discrepancies between databases and for the alterations on the test cards. However, Person 1 was unable to provide any plausible explanation, other than deliberate fraud, for the discrepancies and alterations.

19. The BRADKEN employees participating in the June 1 interview, along with other members of BRADKEN management, concluded that Person 1's denials were not credible, and found more credible Person 1's initial admission that Person 1 had falsified the test results.

United States v. Bradken, Inc.
Information - 6

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20. On June 4 and June 8, 2017, and after consulting with counsel and the prime contractor, BRADKEN issued two additional LOAs that BRADKEN expected would be provided to the Navy. The LOAs recounted, and endorsed, Person 1's claims that Person 1 had never falsified test data. Despite BRADKEN management's continued belief that Person 1 had likely falsified the test results, BRADKEN stated in the June 4, 2017 LOA that "our investigation has given us confidence that discrepancies between BRADKEN's various databases and numbers recorded or overwritten on internal worksheets are not indicative of inaccurate data entries in the final certifications." BRADKEN similarly stated falsely in the June 8, 2017 LOA that BRADKEN management "firmly" believed that Person 1's explanations for the database discrepancies were "genuine and well explained."

21. BRADKEN's misleading statements caused Navy decision makers to conclude in June 2017 that Person 1 had not falsified test results. As a result, the Navy limited its investigation of potential fraud at BRADKEN. While BRADKEN conducted in good faith an internal investigation into the existence of additional discrepancies, and disclosed the discrepancies it identified, BRADKEN failed to identify many of the castings for which Person 1 had falsified test results. Further, in those cases where BRADKEN disclosed discrepancies in its databases, it failed to disclose indications that those discrepancies were the result of deliberate fraud by Person 1.

22. The Navy did not discover the true scope of the fraud until after January 2019, when Navy representatives personally reviewed BRADKEN's test cards and identified over 200 additional fraudulent alterations. The delay caused by the misleading statements in BRADKEN's LOAs seriously hindered the Navy's ability to evaluate and remediate the potential safety and operational risks presented by Person 1's fraudulent certifications.

United States v. Bradken, Inc.
Information - 7

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**D.    Execution of the Scheme to Defraud**

23.    As one example of an execution of the scheme to defraud, on or about March 18, 2016, at Tacoma, within the Western District of Washington, BRADKEN provided and caused to be provided to the prime contractor a Certified Metallurgical Test Report for heat number 412715, from which BRADKEN had produced a casting. BRADKEN falsely represented on the Certified Metallurgical Test Report that the Charpy V-notch tests had returned passing values of 58, 51 and 59 foot pounds, when in fact, the true test results were failing values of 48, 41, and 49 foot pounds.

All in violation of Title 18, United States Code, Section 1031.

_____
BRIAN T. MORAN
United States Attorney

_____
ANDREW FRIEDMAN
Assistant United States Attorney

_____
SETH WILKINSON
Assistant United States Attorney

United States v. Bradken, Inc.
Information - 8

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970